# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3322

_____

| | | |
|---|---|---|
| Gregory Watson; Alonzo D. Banks, | * | |
| | * | |
| Plaintiffs-Appellants, | * | |
| | * | |
| Lemont Holloway, | * | Appeal from the United States |
| | * | District Court for the |
| Plaintiff, | * | Western District of Missouri. |
| | * | |
| v. | * | |
| | * | |
| CEVA Logistics U.S., Inc., | * | |
| | * | |
| Defendant-Appellee. | * | |

_____

Submitted: June 16, 2010
Filed: August 30, 2010

_____

Before MELLOY, HANSEN, and SMITH, Circuit Judges.

_____

MELLOY, Circuit Judge.

Gregory Watson and Alonzo Banks challenge the district court's grant of summary judgment to CEVA Logistics U.S., Inc. ("CEVA") on their racially hostile work environment claims under Title VII, 42 U.S.C. § 1981, and the Missouri Human Rights Act ("MHRA"), Mo. Rev. St. § 213.010, *et seq.* The district court held that the plaintiffs could not establish that a hostile work environment existed, and even if

they had shown the environment to be hostile, CEVA took prompt and effective remedial action.   We reverse.

## I. Background

CEVA provides supply-chain management services whereby automobiles are shipped and received by railroad into a railyard operated by the company.  Banks began working for CEVA in September 2004;[1] Watson started in May 2006.  Both are African-American.  They each held a variety of jobs at CEVA, and at one point worked together as members of a "shuttle" crew, as discussed below.  They are also union members of Teamsters Local No. 141.

The plaintiffs' claims are similar in several respects, and we set forth the types of incidents they both cite as contributing to a racially hostile work environment:

- *White co-workers refusing to work with African-American employees*:  Both plaintiffs testified that during pre-shift meetings, white employees routinely refused to work with African-American employees. Banks's testimony indicates that, typically, white employees would single out certain individuals with whom they refused to work but did not explicitly state they would not work with African-American employees generally.  On one occasion, however, it appeared during a pre-shift meeting that Terri Anderson would be assigned to work with an African-American employee.  The supervisor, Allen Kelne, said, "Oh, that's not going to happen."  Banks testified that he asked in front of

---

[1]At the time Banks was hired, union workers were on strike.  The strike ended approximately three or four months later and some of the "old" union employees, who were mostly white, returned to CEVA.  Some replacement workers, like Banks, also retained their jobs. CEVA alleges that animosity has existed since the strike between the old and new workers and attributes problems at the facility largely to internal union conflict.

everyone on the shift, including Watson, whether Terri Anderson did not want to work with black people, to which she responded that "she don't [sic] want to work with black people." Watson also testified that supervisor Kelne reassigned Watson to a different task to avoid having him work with Terri Anderson. Kelne later told Watson that she had refused to work with him, though Kelne would not explain why.

Watson testified that frequently white co-workers would cite safety concerns as a means of avoiding working with African-American employees. On one occasion, for example, while Watson was training as a conductor, Maurice Buckley and other co-workers stopped and exited Watson's train and called over the radio that he was unsafe. Watson was sent elsewhere to work. A co-worker present during this incident became upset because the co-worker believed Watson had done nothing wrong and thought Buckley and Terri Anderson had simply exhibited "racist-type attitudes." As described further below, another co-worker, Lynn Anderson, also refused to work with Watson, claiming he was unsafe.

- *Graffiti in the workplace*: The plaintiffs reported racial graffiti appeared in several locations at CEVA. "KKK" and "I hate n****rs" were carved into a workbench in the employees' locker room, a room visited by virtually all employees on a daily basis. Banks's testimony indicates the carvings were present for months and possibly years. Banks complained to three supervisors throughout 2006, including Todd Cox and Kelne. Watson noticed the carvings for the first time in November 2006 and also complained to Kelne. The plaintiffs also stated that management frequented the area and that the workbench was located close to a manager's locker. Management took no action in response to the multiple complaints until Banks filed an EEOC complaint. Shortly after the EEOC complaint was filed, the carvings were

sanded over. Banks also observed "KKK" carved into lockers and complained to management.

The plaintiffs further maintain that racial slurs were written on the walls and stalls of a bathroom. It is largely unclear from the record what slurs appeared there, though manager Mark Cowens acknowledges that in May 2008 he became aware through other managers that "n***er" was written in a stall. Watson did not report instances of graffiti and it was removed without his complaint. Banks, however, complained, and although the graffiti would be covered up, it would frequently reappear. The plaintiffs also attested that management-level employees regularly used the restroom where the slurs were located.

Watson and Banks also observed railcars spray-painted with racial messages. Both observed a car with "hang a n****r today" painted on the side. Watson observed this message in early 2007 and complained to a supervisor, who told him later that day that the car had been painted over. Banks also saw "kill the n****rs" and "f**k n****rs" painted with swastikas on railcars. In late 2006 or early 2007, Banks complained on several occasions to supervisors, including Kelne, about various instances of graffiti on railcars. Banks testified that at times he would receive responses like "It's out of our control" or "[W]e can't just run out there and paint a railcar and cover it up." Both plaintiffs acknowledged at their depositions that CEVA did not own the railcars and that they did not know if co-workers painted these messages or if they came into the yard painted with the messages.

- *Employees displaying Confederate flags[2] and other racial emblems*: Both plaintiffs maintain that several white co-workers regularly exhibited the Confederate flag at CEVA, mostly on items of clothing, and attested that it occurred in front of management. Buckley wore a headband and displayed a tattoo with the flag. Banks testified that he reported the headband to management, from whom he received no response. In 2006, Watson also complained to Kelne about Buckley's tattoo. According to CEVA, Cowens became aware of the tattoo and Buckley was instructed to cover it. Watson also saw co-worker Steven Alexander wear garments displaying the flag that year. There is no evidence Watson complained about Alexander.

  Both testified that they observed additional unidentified individuals wearing garments with offensive emblems. Watson saw one individual wearing a shirt with a Confederate flag and overheard another employee complaining about it. Banks saw employees whom he did not know from a different shift wearing

---

[2]We note that CEVA does not dispute that the display of the Confederate flag could be and was interpreted by the plaintiffs as a symbol of racial animus in this case. We will analyze it as such here. We further observe that other courts have found the display of this emblem significant in assessing the existence of a racially hostile work environment. See, e.g., Armstrong v. Whirlpool Corp., 363 F. App'x 317, 326 (6th Cir. 2010) (unpublished); Mack v. ST Mobile Aerospace Eng'g, Inc., 195 F. App'x 829, 837–38 (11th Cir. 2006) (unpublished). We acknowledge, however, that the flag may be displayed at times for other, less racially-charged reasons, such as a reference to Southern heritage or regional pride. See Dixon v. Coburg Dairy, Inc., 369 F.3d 811, 820–26 (4th Cir. 2004) (en banc) (Gregory, J., concurring in the judgment) (discussing the symbolism of the Confederate flag, the interaction between employee's free speech rights and an employer's obligation to prevent a hostile work environment, and observing that "Over the years since the [Civil] war, some have attempted to divorce the Confederate flags from their intimate connections to these principles of subordination, but for many viewers of the symbol such a disconnect is impossible because of the historical facts and the overwhelming negative connotations which continue to flow therefrom.").

shirts with a swastika on them.  Banks complained about these individuals to supervisors, including Kelne, who did not respond.

- *False accusations of safety violations and co-workers creating dangerous situations*:  Watson and Banks worked together from July 2006 to January 2007 on the shuttle crew, which consisted solely of Watson, Banks, and one other African-American employee.   During this period, white co-workers, some of whom engaged in other racist behavior, as well as supervisor Kelne, made false accusations of safety violations over the radio that could be heard by management.   If believed, the accusations could have been grounds for termination.  At his deposition, Watson specified that in late 2006 or early 2007 Terri Anderson falsely accused him of throwing a switch in front of a train the wrong way.  In mid-2007, Lynn Anderson accused him of the same mistake. Watson further testified that other employees also accused the shuttle crew of failing to tie down hand breaks on railcars and inspecting rail cars incorrectly. Banks testified that Kelne falsely accused him of being in the "red zone," apparently meaning he was at an unsafe distance from the trains.

  Around this time, the plaintiffs stated co-workers also created unsafe working conditions in an effort to have them terminated or injure them.  Both Banks and Watson received warnings from co-worker Brian Atkins.  They complained to Kelne, who, according to Banks, indicated that he was aware of what was happening and told them to "tough it out" because they had "targets on [their] backs" and were not liked.

- *Instances of disparate treatment*:  Watson testified that he was on a shuttle operated by another African-American co-worker when the wheels fell off the vehicle. Both were immediately sent for drug testing and were suspended. Watson  filed a grievance, complaining that he had been on a shuttle operated

by a white employee when the same incident occurred and no disciplinary action was taken.

Banks testified that he was written up for wearing a tank top on a hot day when white co-workers on the same shift wore tank tops frequently without discipline. Additionally, in October 2008, after he filed the instant lawsuit, Banks was terminated for sleeping on the job. Banks stated other white workers were allowed to sleep without facing discipline. He filed a grievance and was reinstated.

The plaintiffs also cite various verbal slurs, comments, and other instances of harassment directed at them or other African-American employees. We discuss the plaintiffs's alleged instances of harassment separately. According to Watson, he experienced the following slurs:

- Watson was called to work an overtime shift because a white co-worker refused to work with an African-American employee, Marcus Gay. Later that day, Watson overheard the co-worker say in reference to Gay, "I told you I wasn't going to work with that n****r." Watson did not complain about the slur.

- At some time between mid-2006 and early 2007, Watson was waiting to go to the railyard with other employees, including Lynn Anderson and Atkins. Lynn Anderson said to Atkins, "I hate them damn n****rs" and called over the radio that Watson had crossed in front of the train, which he had not done, and stated she did not want to work with him because he was unsafe. Watson could not hear what she said due to the noise of the trains, but Atkins reported the comment to Watson a few minutes later.

- On another occasion, Alexander said to Watson, "N****r, go down there and throw the switch." Watson turned around and asked Alexander to repeat the

comment. Watson acknowledged that he was "so mad that I wanted to hit him. I really physically wanted to hurt him." Watson and Alexander started walking toward one another as if they wanted to fight. When they were within thirty to forty feet of each other, Alexander turned away. Watson continued to walk toward Alexander for another ten to fifteen feet before turning around. Watson reported the incident to a manager, who took no action.

- In 2008, co-worker William Martin said to Watson, "I told your black ass I wasn't going to do it." Supervisor Charles Forney was present at the time, but did not immediately respond. Watson confronted Forney the following day. Forney asked, "Well, what do you want me to do about it?" Watson replied, "You're asking me what you should do?" Forney asked again what Watson wanted to happen, to which Watson stated, "Don't worry about it, Chuck." CEVA maintains that Martin was suspended and later terminated for the comments. Forney later told Watson, however, that Martin had made other comments as well.

  During a six-month review following the incident, a supervisor deemed Watson's performance unsatisfactory in part because Watson had failed to use the chain of command in reporting the Martin incident. Watson filed a grievance and the review was later changed.

  Banks described verbal slurs and comments while employed at CEVA. These include:

- In the summer of 2005, in response to problems Banks was having with Lynn Anderson, manager Cowens stated, "Well, you are a large black male." Banks testified that he did not like the comment but did not think it was discriminatory.

- In late 2005 or early 2006, an African-American co-worker, Silk Terri, told Banks that a white employee had called the co-worker a n****r. Banks advised the co-worker to go to management.

- Another supervisor, Jason Seura, walked by Banks and called him a "goon" and made other comments over the course of about a week.[3] Banks believes he heard Seura also say, "I'm going to get you canned, n****r." Seura subsequently wrote up Banks for sleeping at work, which Banks testified he had not done.

- Banks and a co-worker named Kyle became involved in a heated conversation while riding in a car together on the job. At one point in the conversation, Banks asked Kyle if he had a problem with black people. Kyle responded that he did and explained that black people sold drugs and were violent. Banks responded that white people had forced black people into slavery, but that black people did not hold white people accountable for what their forefathers had done and were simply trying to earn an honest living. Instead of verbally responding, Kyle spit chewing tobacco on an African-American co-worker, Gay, who was present in the car. Banks called Kyle a coward. Banks and Gay reported the incident to supervisor Cox. Banks explained to Cox that he did not feel comfortable working with Kyle and that he feared for his and Gay's safety. Cox responded, "It is what it is. Look at the guy's truck" and did nothing further. Banks testified that Kyle's "whole truck is a Confederate flag."

- Banks once asked Alexander if he liked black people. Alexander responded that he did not.

---

[3]Banks testified that Seura also called him a "beast," but that he was not offended by it because Banks had been working out frequently at the time and recognized the term as a compliment.

- Banks and another co-worker were rushing to meet a train and ran past employee Ryan Fisher. Banks thought he heard, Fisher say "f**king n****r" as he ran past. Subsequently, the co-worker confirmed that Fisher had said, "You and that f**king n****r ran in front of the train, and you know that's a safety violation. You can get in trouble. I can take you both to the third floor." Banks had not run in front of the train, as Fisher stated. Banks reported the comment to management.

The district court held that neither Watson nor Banks established the existence of a hostile work environment. It found, for example, that the racial slurs and comments to which the plaintiffs were subjected were isolated and infrequent and that neither plaintiff had been physically threatened. It further held that even if they had established a prima facie case, CEVA responded adequately when it became aware of the racial comments and graffiti. Watson and Banks appeal, largely arguing that the district court misconstrued the record as to the severity of the harassment and that CEVA's responses to the harassment were, at best, mixed.

## II. Discussion

"We review grants of summary judgment *de novo*." Reedy v. Quebecor Printing Eagle, Inc., 333 F.3d 906, 907 (8th Cir. 2003). "Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." Id. (quotation omitted).

Claims under Title VII, § 1981, and the MHRA are analyzed under the same standards. See Gipson v. KAS Snacktime Co., 171 F.3d 574, 578 (8th Cir. 1999) (Title VII and MHRA); Eliserio v. United Steelworkers of Am. Local 310, 398 F.3d 1071, 1076 (8th Cir. 2005) (Title VII and § 1981). "[A] plaintiff must show that he or she is a member of a protected group, that there was 'unwelcome harassment,' that there

was a causal nexus between the harassment and membership in the protected group, and that the harassment affected a term, condition, or privilege of employment." Williams v. ConAgra Poultry Co., 378 F.3d 790, 794 (8th Cir. 2004). To the extent non-supervisory employees are responsible for the harassment, "the plaintiff must also show that the employer knew or should have known about the harassment but failed to take proper action." Id. at 794–95.

Harassment which is severe or pervasive is "deemed to affect a term, condition, or privilege of employment." Singletary v. Mo. Dep't of Corr., 423 F.3d 886, 892 (8th Cir. 2005). The standard is a demanding one, and "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" will not suffice. Arraleh v. County of Ramsey, 461 F.3d 967, 979 (8th Cir. 2006) (quotations omitted). Additionally, "[m]ere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to support a claim of hostile work environment." Id. (quotation omitted). To sustain a claim, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Singletary, 423 F.3d at 892 (quotation omitted). Further, the hostile work environment must be both objectively and subjectively abusive. See Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 843 (8th Cir. 2002).

CEVA mainly disputes whether the harassment was objectively severe and pervasive to create a hostile work environment. It frames the case as one involving slurs and racial graffiti and maintains that both were too sporadic and insufficiently threatening to alter the terms and conditions of the plaintiffs' employment. It further argues that the none of the arguably facially neutral conduct Watson and Banks complain of, such as the false accusations and efforts at sabotage, can be tied to racial animus. We conclude, however, that CEVA mischaracterizes several incidents and largely fails to acknowledge that the plaintiffs are entitled to reasonable inferences

from the evidence presented. Accordingly, viewing the record in the light most favorable to Watson and Banks, we hold material questions of fact exist as to whether the plaintiffs were subjected to a racially hostile work environment.

In analyzing the case as one involving primarily slurs and graffiti, CEVA has come to focus heavily on the frequency of these incidents. To be sure, our case law suggests that frequency is often an important consideration. See, e.g., Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 759–60 (8th Cir. 2004); Elmahdi v. Marriott Hotel Servs., Inc., 339 F.3d 645, 653 (8th Cir. 2003); Woodland, 302 F.3d at 844. We have repeatedly emphasized, however, that frequency is not the only factor we examine—both in situations where we have found the existence of a hostile work environment and where we have not. See, e.g., O'Brien v. Dep't of Agric., 532 F.3d 805, 809 (8th Cir. 2008); Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 911 (8th Cir. 2006); Bowen v. Mo. Dep't of Soc. Servs., 311 F.3d 878, 885 (8th Cir. 2002).

Rather, as often stated, the inquiry requires a consideration of the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Arraleh, 461 F.3d at 979 (quotation omitted). The court may also consider the "physical proximity to the harasser, and the presence or absence of other people." Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999). "Harassment need not be so extreme that it produces tangible effects on job performance or psychological well-being to be actionable." Id. (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993)). We remain cognizant of the fact that "[a] work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it into a series of discrete incidents." Carter, 173 F.3d at 702 (quotations omitted).

Regardless of the frequency of the slurs and comments, other considerations lend weight to their severity in this case. "[T]his is not a situation where racial jokes and innuendo were merely bandied about the workplace with no particular target, or where [the plaintiffs were] called names behind [their] back[s] but [were] unaware of it." Delph v. Dr. Pepper Bottling Co. of Paragould, Inc., 130 F.3d 349, 356 (8th Cir. 1997). Several of the comments were directed at plaintiffs and were made in their presence. Some comments were also directed at the plaintiffs in the presence of others, including Lynn Anderson's comment, "I hate them damn n****rs," in reference to Watson, and Ryan Fisher's reference to Banks as a "f**king n****r."[4] Additionally, some of the comments were made in a manner that a jury could reasonably conclude would be particularly demeaning or humiliating to the plaintiffs. In that regard, we take note of Martin's comment, "I told your black ass I wasn't going to do it," which was said to Watson in front of a supervisor, rather than another co-worker. Finally, we note that slurs and other incidents evidencing racial animus were directed at co-workers in the same protected group. This is relevant in assessing the existence of a hostile work environment, particularly where as here, the plaintiffs were aware of this conduct. See Sandoval v. Am. Bldg. Maint. Indus., Inc., 578 F.3d 787, 802–03 (8th Cir. 2009).

We are also troubled by CEVA's arguments concerning the graffiti. Specifically, we reject arguments that the plaintiffs had to articulate with absolute precision the number of times they saw the graffiti and that we should analyze each viewing as a separate instance of harassment. To that end, the "key difference" between graffiti and

---

[4]CEVA urges us to dismiss these comments because the plaintiffs did not hear them directly or clearly and because co-workers reported or confirmed their contents to the plaintiffs shortly after they were made. We think CEVA's arguments on this point generally mischaracterize these incidents and fail to take into account the circumstances in which they were made. This is not a case, for example, where the plaintiffs could not recall the instances well or were overly unsure about what was said, or where the plaintiffs learned substantially after the fact about comments made out of their presence.

a racial slur should not be overlooked: "the slur is heard once" and "vanishes in an instant, while graffiti remains visible until the employer acts to remove it." Jerome R. Watson & Richard W. Warren, "I Heard it through the Grapevine": Evidentiary Challenges in Racially Hostile Work Environment Litigation, 19 Lab. Law. 381, 399, 404 (2004). This is particularly true for the workbench carvings, which the record establishes were present for a considerable amount of time, and Bank's discussion of the bathroom graffiti, which frequently reappeared. A jury could reasonably conclude that the plaintiffs saw this graffiti on numerous occasions and, furthermore, that their mere awareness of its ongoing presence—regardless of the exact number of times they can remember seeing it—could contribute to a hostile work environment.

In any event, as previously suggested, we view this case as one involving more than a few slurs and instances of graffiti. The record suggests that the display of the Confederate flag by other employees was an ongoing occurrence at the facility, and as noted above, CEVA does not contest that this symbol evidences racial animus. The company also presents essentially no argument concerning the instances of disparate treatment the plaintiffs describe, including whether they were similarly situated to the individuals claimed to have received preferential treatment. Furthermore, we reject CEVA's contentions that other incidents the plaintiffs experienced exhibit no tie to race, particularly white co-workers' refusals to work with Watson and the false safety accusations the plaintiffs experienced. It is well established that "[a]ll instances of harassment need not be stamped with signs of overt discrimination . . . if they are part of a course of conduct which is tied to evidence of discriminatory animus." Carter, 173 F.3d at 701. Notably, several of the same employees—Steven Alexander, Terri Anderson, Lynn Anderson, and Maurice Buckley in particular—were involved both in overtly racial incidents as well as incidents that were facially neutral. This fact supports the plaintiffs' claims that these allegedly neutral occurrences were, in fact, racially motivated and part of a pattern of harassment. See Diaz v. Swift-Eckrich, Inc., 318 F.3d 796, 800 (8th Cir. 2003) (harassing co-worker's "early comments, in which she demeaned Hispanics and specifically referred to [the plaintiff] as 'stupid,' are

-14-

sufficient for a fact-finder to find that her ongoing harassment of [the plaintiff] was based on her national origin."); see also Carter, 173 F.3d at 701 (noting that "[m]otive may need to be proved by the use of inferences . . . .")

Finally, contrary to CEVA's arguments, we believe the record contains incidents a reasonable jury could view as threatening or intimidating. CEVA continues to emphasize that none of the graffiti, for example, contained specific threats against the plaintiffs, unlike in some of our other actionable cases. See Reedy, 333 F.3d at 909 (graffiti included the phrase "kill all n****rs" with the plaintiff's name written under it); Jackson v. Flint Ink. N. Am. Corp., 382 F.3d 869, 870 (8th Cir. 2004) (graffiti included plaintiff's name written with an arrow connecting it to a burning cross and "KKK"). We once more reject CEVA's narrow view of the record and conclude that several incidents could be reasonably viewed as threatening or intimidating. Banks's interaction with Kyle is one example: Kyle spat tobacco at another African-American employee who was present during their racially charged conversation. Banks reported to a supervisor that he feared for his safety, and we cannot say as a matter of law that this fear was unreasonable. Watson's interaction with Steven Alexander after Alexander stated "N****r, go down there and throw the switch" is another. While reasonable minds might differ, a jury could conclude that Alexander provoked a reaction from Watson and then threatened him with physical violence. More bothersome, however, remain the plaintiffs' statements that co-workers created dangerous situations in an effort to sabotage and potentially injure them. In downplaying this evidence, CEVA would have us overlook testimony that the plaintiffs had received warnings from a co-worker that others might attempt to harm them.

We also conclude that the plaintiffs have come forth with sufficient evidence that CEVA knew or should have known about the harassment and failed to take prompt

and effective remedial measures.[5]   Turning to the adequacy of CEVA's remedial actions, "this court considers the amount of time between notice of the harassment and any remedial action, the options available to the employer such as employee training sessions and disciplinary action taken against the harassers, and whether or not the measures ended the harassment." Jenkins v. Winter, 540 F.3d 742, 749 (8th Cir. 2008) (quotations and internal alterations omitted).  Although the company did respond to some instances of harassment, including painting over bathroom graffiti, painting over the "hang a n****r today" sign on the railcar, and firing Martin, a reasonable fact finder could conclude that supervisors at other times acquiesced in discriminatory behavior or were at least indifferent to complaints.  The record contains several examples of this:  Kelne reassigned Watson's tasks in order to accommodate Terri Anderson; Kelne told the plaintiffs to "tough it out" because they had "targets on their backs" in response to other complaints; and Cox responded to Banks's complaints about a co-worker by stating, "It is what it is" and referenced  the co-worker's truck emblazoned with the Confederate flag.  Further, although the workbench was eventually sanded over, a reasonable jury could conclude that the response was neither prompt nor effective.  "When a plaintiff shows that an employer has a mixed record with regard to handling harassing incidents, we have generally determined that there is a genuine issue of material fact to be decided by a jury . . . ." Reedy, 333 F.3d at 910.

We have little trouble in concluding a reasonable jury could find in favor of the plaintiffs concerning the appropriateness of CEVA's response.

---

[5]We note that Watson and Banks have not challenged whether summary judgment was proper on the basis of CEVA's liability for supervisor harassment.  We therefore confine our analysis to the arguments presented: whether the district court erred in granting summary judgment on the basis of CEVA's remedial actions as to co-worker harassment.

For the foregoing reasons, we hold summary judgment was improper on this record. We reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

_____