# United States Court of Appeals

### For the Eighth Circuit

_____

No. 24-2082

_____

Equal Employment Opportunity Commission

*Plaintiff - Appellant*

v.

BNSF Railway Company

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: May 15, 2025
Filed: August 28, 2025

_____

Before COLLOTON, Chief Judge, SMITH and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

The Equal Employment Opportunity Commission (EEOC) brought this enforcement action against BNSF Railway Co., alleging a hostile work environment at the BNSF railyard in Alliance, Nebraska (Alliance Railyard). The EEOC sued on behalf of Rena Merker, a train conductor at the Alliance Railyard, and a group of similarly aggrieved women. The district court dismissed the EEOC's claim on behalf of the similarly aggrieved women because it found that the EEOC pleaded neither

the class size nor that the class suffered the same type of harassment as Merker. It later granted BNSF's motion for summary judgment for the claim on Merker's behalf because it found that the harassment was not sufficiently severe or pervasive to affect a term of employment. The EEOC argues that the district court erroneously applied heightened pleading standards in dismissing the claim on behalf of the other women. It also argues that summary judgment was not proper for the claim on behalf of Merker because there are genuine issues of material fact. We agree, reverse both judgments, and remand for further proceedings.

## I. *Background*

"Title VII protects all employees of and applicants for employment with a covered employer, employment agency, labor organization, or training program against discrimination based on race, color, religion, sex, or national origin." *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 323 (1980). "When Title VII was enacted in 1964, it authorized private actions by individual employees and public actions by the Attorney General in cases involving a pattern or practice of discrimination." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 286 (2002) (internal quotation marks omitted). But "[i]n 1972, Congress amended Title VII to authorize the EEOC to bring its own enforcement actions." *Id.* In these statutes,

> Congress established an integrated, multistep enforcement procedure culminating in the EEOC's authority to bring a civil action in a federal court. First, an employee files with the EEOC a charge alleging that an employer has engaged in an unlawful employment practice. Second, the EEOC is then required to investigate the charge and determine whether there is reasonable cause to believe that it is true. If reasonable cause does exist, the EEOC moves to the third step, which attempts to remedy the objectionable employment practice through the informal, nonjudicial means of conference, conciliation, and persuasion. However, if unsuccessful, the EEOC may move to the fourth and final step and bring a civil action to redress the charge.

*EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657, 672 (8th Cir. 2012) (cleaned up). This process created "sequential steps in a unified scheme for securing compliance

with Title VII." *Id.* (emphasis omitted) (quoting *EEOC v. Hickey–Mitchell Co.*, 507 F.2d 944, 948 (8th Cir. 1974)).

This appeal involves the final step. Merker was a train conductor working out of the Alliance Railyard from October 2011 to March 2022. "On January 17, 2018, Merker filed a charge of discrimination with the EEOC on behalf of herself and other women employed at BNSF, alleging sex-based harassment, disparate treatment, and retaliation." Appellant's Br. at 2. The EEOC investigated Merker's charge and found reasonable cause to believe that BNSF "violated Title VII by subjecting Merker and other female employees at [the Alliance Railyard] to harassment and sexual harassment, beginning as early as November 2011." R. Doc. 41, at 2–3. The EEOC was unable to secure a conciliation agreement with BNSF. The EEOC then "filed this action asserting a hostile-work-environment claim under Title VII and seeking relief for Merker and a class of women who worked out of [the] Alliance [R]ailyard." Appellant's Br. at 2.

A. *First Amended Complaint*

The EEOC's First Amended Complaint brought one count under Title VII for a hostile work environment against BNSF. It alleged that BNSF "subject[ed] Merker and other similarly aggrieved women working out of [the] Alliance . . . [R]ailyard to a near daily barrage of sexually harassing conduct by both coworkers and supervisors." R. Doc. 10, at 3. It alleged dozens of instances of harassment, including that male employees made unwelcome sexual advances to female employees followed by aggressive behavior when the women rejected the advances. Male employees also made unwelcome comments about women's bodies, sexually explicit jokes in front of supervisors, and derogatory comments about women's abilities to work at the railroad. When women reported the harassment, supervisors brushed off the comments and did not reprimand the male employees. For example, the EEOC alleged that a male engineer spread rumors that Merker "was 'sleeping around' on a work trip and told her that working on the road 'was not a woman's job.'" *Id.* at 6. When Merker reported this, supervisors "laughed and responded, 'Welcome to the railroad.'" *Id.* The EEOC alleged that "BNSF itself contributed to

creating a sexually charged atmosphere at its workplace by issuing t-shirts with sexualized 'double-entendre' messages to . . . Alliance . . . [Railyard] employees. The front of the T-shirts said 'Shoving' and the back said, 'Got Protection?'" *Id.* at 10.

The EEOC also alleged that there was "sexual graffiti that was perpetually present [at the Alliance Railyard] and on the locomotives from 2011 to the present." *Id.* at 7. It alleged that BNSF "failed to meaningfully address" this graffiti. *Id.* For example, there was "[a] drawing in the women's locker room of a woman sucking a penis above an eye wash station." *Id.* There were sexually explicit drawings of naked women and sexually explicit words on locomotives. When a female employee asked the superintendent about the graffiti, the superintendent "responded, 'Just get a Sharpie. What is with you women lately?'" *Id.* at 7–8. When another female employee complained, a supervisor told her, "Just don't look at it." *Id.* at 8. The EEOC also alleged that sexually explicit pictures were displayed at the Alliance Railyard, including "a framed picture of a man with his penis hanging out of his shorts" that was "posted at one of the main exits" where "[a]ll employees, including supervisors, walked . . . daily." *Id.* at 7.

The EEOC alleged that "unisex locomotive restrooms were frequently soiled with urine and feces by male employees," often for the purpose of harassing women. *Id.* at 8. For example, a male employee "told Merker he intentionally rubbed his penis on the locomotive phone and urinated on the toilet seat and walls of the locomotive bathroom because he believed the female employee riding with him was trying to get him in trouble for sexual harassment." *Id.* Another female employee slipped on urine-soaked steps of a locomotive and had to "place her hands" on urine covered handrails "when she exited the locomotive to perform a train check." *Id.* The EEOC also alleged that "[a] dead bird was left on the toilet seat of a female [c]onductor's train." *Id.* "The unsanitary conditions of the restrooms led female employees on the trains to avoid using them to the point that at least two female employees contracted urinary tract infections in 2018 as a result of avoiding the restroom." *Id.* Further, "in January 2018[,] a fake video camera was discovered

above a unisex locomotive restroom with a sign stating, 'for research purposes only.'" *Id.* at 9.

BNSF moved to dismiss the First Amended Complaint for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). The district court found that the EEOC "sufficiently alleged a hostile-work-environment claim on Merker's behalf." R. Doc. 28, at 9. It found that "Merker [was] a member of a protected group and was subjected to unwelcome harassment," such as "gender-based insults" and "graffiti [that] either referenced female body parts in vulgar ways or was located in places primarily occupied by females, such as the women's locker room." *Id.* at 10. The court also found that "BNSF knew or should have known of the harassment and failed to properly remedy it" because "Merker reported the harassment multiple times to her supervisors and BNSF's human resources department." *Id.* It also found that the EEOC "plausibly stated that the alleged harassment created an objective hostile work environment" because she endured "demeaning comments almost daily and saw perpetually present vulgar graffiti." *Id.* at 11 (internal quotation marks omitted).

The district court then held that the EEOC "[f]ailed to [s]tate a [c]laim on [b]ehalf of the [o]ther [f]emale [e]mployees." *Id.* at 12 (emphasis omitted). It rejected BNSF's argument that under *CRST*, 679 F.3d at 674, the EEOC had "to identify each individual on whose behalf it brings suit." R. Doc. 28, at 12. The court found that *CRST* was "not determinative on the question of whether the EEOC ha[d] stated a plausible claim for relief on behalf of the other female employees" because it was on the issue of conciliation—the step before the EEOC brings suit—and was decided at summary judgment. *Id.* at 13. It found "little caselaw analyzing the EEOC's pleading requirements when suing on behalf of several individuals." *Id.* at 14. Nonetheless, it imposed two additional requirements that the EEOC must plead when suing on behalf of a group.

First, the district court found that the EEOC had to plead that the group "suffered similar discrimination by the same actors during the same time frame as

-5-

the charging party." *Id.* at 18. The EEOC is permitted "to bring suit in its own name, on behalf of a 'person or persons aggrieved' by the employer's unlawful employment practice." *Id.* at 14 (quoting *CRST*, 679 F.3d at 672). The court compared this posture to cases in which a party wishes to intervene in an EEOC enforcement action. "In the context of determining a right to intervene, courts have found that 'persons aggrieved' includes 'a person who has a nearly identical claim to a charging party even if the nearly identical claimant has not previously filed a charge with the EEOC.'" *Id.* at 17 (quoting *EEOC v. Albertson's LLC*, 579 F. Supp. 2d 1342, 1347 (D. Colo. 2008)). Thus, the court applied that definition of "persons aggrieved" as a limiting factor for claims that the EEOC could bring in the enforcement action itself. *Id.* at 18. It held that the EEOC failed to plead that the group suffered the same harassment as Merker because "[m]any of the EEOC's allegations d[id] not say when the discriminatory acts occurred or explain which female employee experienced what harassment." *Id.* at 22.

Second, the district court found "that the EEOC [was] required to plead sufficient facts for the defendant to ascertain the relative size of the group for which the EEOC is making a claim." *Id.* at 18. It could not "determine 'whether the instant Section 706 lawsuit involve[s] two, twenty[,] or two thousand "allegedly aggrieved persons."'" *Id.* (first alteration in original) (quoting *EEOC v. CRST Van Expedited, Inc.*, No. 07–CV–95–LRR, 2009 WL 2524402, at *8 (N.D. Iowa Aug. 13, 2009) (unpublished)). The court said that BNSF had "a right to have reasonable notice of the number of people" in the group and that it "would be unable to resolve inevitable discovery disputes involving whether a particular discovery request was proportional to the needs of the case." *Id.* at 19. It held that the EEOC did not meet this requirement because the complaint gave "no idea of the size of the group of female employees." *Id.* at 22. The court then gave the EEOC "14 days to amend [its complaint] so that it c[ould] correct the deficiencies." *Id.* at 23.

## B. *Second Amended Complaint*

The EEOC filed a Second Amended Complaint, which made several changes. It defined the group as "women who worked in TY&E [Trainmen, Yardmen, and

Engineers] and Yard Master positions from March 23, 2017 to the present" at the Alliance Railyard. R. Doc. 41, at 4. It alleged that BNSF "employs approximately 485 individuals in TY&E positions and . . . approximately 8 to 10 individuals in Yard Master positions at [the] Alliance . . . [R]ailyard." *Id.* "[A]pproximately five percent or fewer of the individuals employed in these positions . . . were or are female." *Id.* The Second Amended Complaint also "provided a timeframe during which the harassment occurred"; "generally identified the harassers as men who worked out of [the] Alliance [R]ailyard in TY&E and Yard Master positions, and in related supervisory and management positions"; and "alleged that BNSF was aware of the harassment and failed to take prompt remedial action." Appellant's Br. at 8.

The EEOC also "provided additional details about the harassment that women experienced," which included "four anonymized exemplars" who suffered harassment at the Alliance Railyard. Appellant's Br. at 6. Jane Doe was "one of two women who contracted a urinary tract infection" in 2018 because of the unsanitary bathroom conditions; endured sexually explicit jokes and comments; "was forced to work in the presence of sexual and sexually hostile graffiti, including drawings of male genitalia, on trains on an almost daily basis"; and was harassed by a male coworker at a hotel after she rejected his advances in 2019. R. Doc. 41, at 9. Sally Doe endured sexist and sexually explicit comments and advances, which "caused her severe emotional and mental distress." *Id.* at 11. Karen Doe experienced unwelcome sexual advances from coworkers as early as 2011, heard sexist comments about other women, and saw the sexual graffiti "[f]rom at least October 2011 to the present." *Id.* at 12. Tina Doe endured stalking at work in 2015 after she broke up with a male coworker. This coworker became so aggressive that a supervisor "had to physically block the male employee from getting to her" and the police had to escort her home. *Id.* at 13. The male employee, however, was "not disciplined for his actions." *Id.* When Tina Doe reported the graffiti in 2018, the superintendent told her to "get a Sharpie" or not look at it. *Id.* The EEOC realleged the unsanitary bathroom conditions, which were "purposefully soiled to make them unsanitary and unusable by women," and the vulgar graffiti at the Alliance Railyard. *Id.* at 14.

BNSF moved to dismiss the Second Amended Complaint for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). The district court granted the motion and dismissed "the EEOC's claim on behalf of female employees other than . . . Merker." R. Doc. 74, at 35. First, the court found that the EEOC did not adequately plead that "Merker, the exemplars, and the other aggrieved individuals experienced the same or similar types of sexual harassment." *Id.* at 22. The court analyzed each "category of harassment" and compared sexual comments about women's bodies, comments belittling women, sexual graffiti, and unsanitary bathroom conditions. *Id.* at 23. For example, the court found "a difference between comments about a particular woman's body made to her and comments about other women's bodies that a woman overhears." *Id.* at 24. But "[t]he larger problem," *id.* at 27, was that the EEOC did not show the harassment was created by the same harassers because it identified "[v]ery few harassers . . . by name," *id.* at 28. Further, the EEOC pleaded some allegations that "occurred at unknown and possibly unrelated times" and some "scattered over a period from 2011 to 2020." *Id.* The court therefore held that the EEOC failed to plead that the harassment occurred at the same time.

Second, the court again held that the EEOC did not adequately plead the size of the group. It found that the EEOC's additional allegations were insufficient because it "alleged no factual basis for estimating the rate of turnover." *Id.* at 30. Although the EEOC provided an estimated number of women working in these positions at the Alliance Railyard, the number of women could be 25 if there was no turnover and up to 137.5 if there was complete turnover every year.

C. *Summary Judgment*

The EEOC's case proceeded on Merker's behalf alone. BNSF moved for summary judgment in December 2023, but in its reply brief filed in February 2024, it informed the court that Merker died the month prior. The district court considered the motion nonetheless because the EEOC still had "the authority to continue to prosecute this case—and BNSF [did] not argue otherwise." R. Doc. 152, at 10. The court reasoned that the EEOC's authority to sue in its own name under § 706 of Title VII, 42 U.S.C. § 2000e-5, was not dependent upon the aggrieved person. For

example, "in *Waffle House*, the Supreme Court rejected the Fourth Circuit's conclusion that the EEOC could not recover victim-specific relief because the aggrieved employee himself would be ineligible for such recovery because of a binding arbitration agreement." *Id.* (emphasis added) (citing *Waffle House*, 534 U.S. at 291). Thus, the court held that "the EEOC's lawsuit is entirely its own and may proceed even if the aggrieved individual cannot sue for whatever reason, including his or her death."[1] *Id.* at 11.

The court ultimately granted summary judgment to BNSF. First, the court found that the EEOC could not seek relief for harassment that occurred before March 23, 2017—300 days before Merker filed her charge with the EEOC. *See* 42 U.S.C. § 2000e-5(e)(1). We have said that "[a] charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." R. Doc. 152, at 34 (second alteration in original) (quoting *Jenkins v. Mabus*, 646 F.3d 1023, 1026 (8th Cir. 2011)). The question is whether the "[a]cts before and after the limitations period . . . are so similar in nature, frequency, and severity [that they] must be considered to be part and parcel of the hostile work environment." *Id.* (cleaned up) (quoting *Jenkins*, 646 F.3d at 1027). Here, the district court held that the conduct before March 23, 2017, was not similar to the conduct after March 23, 2017. For example, the EEOC alleged that a male coworker "showed Merker a picture of a topless female BNSF employee" before 2016. *Id.* at 36. The court found that this was not similar to allegations that there was a sexually explicit picture of a man posted at the Alliance Railyard in 2019 because it was not a photo of a woman. Further, the pre- and post-limitations conduct was not similar because the EEOC did not have specific dates for allegations regarding crude comments and sexual images nor did it allege that the same harassers engaged in the conduct. The EEOC alleged that the graffiti started in 2011. But the court found such evidence was time-barred because Merker said she first saw it in 2011 but did not report it until 2017. The court characterized the 2011 graffiti as a "single prior incident" that

---

[1]This holding is not on appeal.

did not give rise to a continuing violation, especially because there was no evidence that the same harassers created the graffiti. *Id.* at 38.

Second, the court held that the "conduct toward Merker . . . [did] not rise to the level of an actionable hostile work environment as a matter of law" because it was not sufficiently severe or pervasive to affect a condition of employment. *Id.* at 54. It found that the sexist comments about women were "boorish, offensive, and wrong-headed" but were too "sporadic." *Id.* at 56. The sexual jokes were "inappropriate" but "part of the 'ordinary tribulations of the workplace' . . . that [were] not [themselves] actionable." *Id.* (quoting *Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 799 (8th Cir. 2021)). Similarly, the "two incidents involving photos of exposed genitalia in two years [was] too sporadic to be actionable." *Id.* The court said that "[t]he evidence of sexual graffiti [was] a somewhat closer question." *Id.* at 57. It compared this graffiti to the racist graffiti that we found actionable in *Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 943–44 (8th Cir. 2010). But the court distinguished *Watson* because the graffiti at the Alliance Railyard was "prurient and disgusting but . . . [did] not state threats to the lives of women." R. Doc. 152, at 58. The court also said:

> [C]ommon sense, and an appropriate sensitivity to social context—that is, to the fact that the graffiti was on locomotives or in railyard facilities where most of the workforce are members of the same sex (male), as opposed to a professional office—distinguishes the graffiti at issue here from graffiti that a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Id.* (internal quotation marks omitted). Thus, "the [c]ourt conclude[d] that . . . the alleged harassment to which Merker was subjected during the limitations period, taken as a whole, was not sufficiently severe or pervasive to be actionable." *Id.* It granted final judgment in favor of BNSF. The EEOC then appealed.

II. *Discussion*

On appeal, the EEOC argues that the district court first erred in dismissing its claim on behalf of the other aggrieved women at the Alliance Railyard. It argues that the district court adopted "novel pleading requirements" that were inconsistent with the plausibility pleading standard that governs in all civil actions. Appellant's Br. at 17. Second, the EEOC argues that the district court erred in granting BNSF's motion for summary judgment for its claim on behalf of Merker. It argues that there were genuine issues of material fact as to whether the pre- and post-limitations conduct were sufficiently similar to constitute one continuing violation; whether the harassment was sufficiently severe and pervasive to constitute a hostile work environment; and whether BNSF knew or should have known about the harassment but failed to take proper action.

A. *Motion to Dismiss*

The district court granted BNSF's Rule 12(b)(6) motion to dismiss the EEOC's claim on behalf of the other women at the Alliance Railyard. The court found that the EEOC needed to satisfy two additional pleading requirements when bringing an enforcement action on behalf of a group and concluded that the EEOC did not satisfy those requirements. "We review the district court's grant of a Rule 12(b)(6) motion to dismiss de novo." *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017). Both parties agree that "ordinary pleading principles apply to EEOC enforcement actions." Appellee's Br. at 17. As such, we consider whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

We conclude that the district court erred in imposing the first pleading standard that required the EEOC to plead that "that all the female employees . . . suffered similar acts of discrimination by the same actors during the same time

frame." R. Doc. 74, at 5. We also conclude that even if the EEOC needed to plead facts giving BNSF notice of the class size, the EEOC adequately did so here.

## 1. *Sameness Prong*

The district court found that the EEOC must plead that the group of women "suffered similar discrimination by the same actors during the same time frame as the charging party." R. Doc. 28, at 18. It did so because the EEOC is authorized "to bring suit in its own name, on behalf of a 'person or persons aggrieved' by the employer's unlawful employment practice." *Id.* at 14 (quoting *CRST*, 679 F.3d at 672). The court said that other courts have allowed people aggrieved to intervene in an EEOC enforcement action if the person "has a nearly identical claim to a charging party even if the nearly identical claimant has not previously filed a charge with the EEOC." *Id.* at 17 (quoting *Albertson's*, 579 F. Supp. 2d at 1347). We conclude that the district court erred because it impermissibly limited the EEOC's enforcement authority to the claims presented by the charging party.

Section 706 of Title VII gives the EEOC "authority to bring suit in its own name for the purpose, among others, of securing relief for a group of aggrieved individuals." *Gen. Tel.*, 446 U.S. at 324. In *General Telephone*, the Supreme Court held "that the EEOC may maintain its § 706 civil actions for the enforcement of Title VII and may seek specific relief for a group of aggrieved individuals without first obtaining class certification pursuant to Federal Rule of Civil Procedure 23." *Id.* at 333–34. The Court said "that the EEOC is not merely a proxy for the victims of discrimination and that the EEOC's enforcement suits should not be considered representative actions subject to Rule 23." *Id.* at 326. "When the EEOC acts, albeit at the behest of and for the benefit of specific individuals, it acts also to vindicate the public interest in preventing employment discrimination." *Id.*

The EEOC argues that "[b]y requiring the EEOC to allege that *all* aggrieved individual suffered the *same* acts, by the *same* actors, at the *same* time, the district court effectively introduced Rule 23's commonality and typicality requirements into the analysis." Appellant's Br. at 33. We agree. In *General Telephone*, the Court

addressed the "typicality requirement" of Rule 23, which "limit[s] the class claims to those fairly encompassed by the named plaintiff's claims." 446 U.S. at 330.

> If Rule 23 were applicable to EEOC enforcement actions, it would seem that the Title VII counterpart to the Rule 23 named plaintiff would be the charging party, with the EEOC serving in the charging party's stead as the representative of the class. Yet the Courts of Appeals have held that EEOC enforcement actions are not limited to the claims presented by the charging parties.

*Id.* at 330–31. The Court thus rejected the notion that Rule 23 should apply to EEOC enforcement actions and said that "[a]ny violations that the EEOC ascertains in the course of a reasonable investigation of the charging party's complaint are actionable." *Id.* at 331.

We conclude that the district court erred in requiring the EEOC to plead that the group of aggrieved women suffered precisely the same harassment as Merker. In doing so, it impermissibly tied the scope of the EEOC's enforcement actions to the claims presented by Merker. *See id.* (finding that the EEOC's enforcement action is not limited "to claims typified by those of the charging party"). It therefore applied an improper heightened pleading standard.

## 2. *Class Size Prong*

The district court also required the EEOC "to plead sufficient facts for the defendant to ascertain the relative size of the group." R. Doc. 28, at 18. In defending this standard, BNSF acknowledges that *CRST* itself does not establish a pleading standard but says that we can "follow[] the logic" of that decision to find that this pleading requirement was proper. Appellee's Br. at 32. The EEOC argues that this standard was not proper because "[c]lass size has no bearing" on "whether the EEOC alleged sufficient factual matter, taken as true, to state a claim that is plausible on its face." Appellant's Br. at 39. It also argues that if we find that *CRST* requires the EEOC to identify members of the class by pleading, "the Supreme Court cast doubt

on *CRST*'s continued viability in *Mach Mining, LLC v. EEOC*, 575 U.S. 480 (2015)." Appellant's Br. at 41.

In *CRST*, we held "that the EEOC wholly failed to satisfy its statutory pre-suit obligations," 679 F.3d at 677, because "it did not reasonably investigate the class allegations of sexual harassment 'during a reasonable investigation of the charge,'" *id.* at 676 (quoting *EEOC v. Delight Wholesale Co.*, 973 F.2d 664, 668 (8th Cir. 1992)). The EEOC brought a "sweeping employment-discrimination suit . . . against CRST, one of the country's largest interstate trucking companies." *Id.* at 665. It sued on behalf of the charging party "and a class of similarly situated female employees" but did not further define the class. *Id.* at 668 (internal quotation marks omitted). "According to the district court, 'it was unclear whether the instant Section 706 lawsuit involved two, twenty or two thousand "allegedly aggrieved persons."'" *Id.* at 669 (quoting *CRST*, 2009 WL 2524402, at *8). In *CRST*, we held that the district court did not err in "bar[ring] the EEOC from pursuing claims as to 67 women based on its failure to reasonably investigate or good-faith conciliate." *Id.* at 671. "[T]he EEOC did not conduct *any* investigation of the specific allegations of the allegedly aggrieved persons for whom it [sought] relief at trial before filing the [c]omplaint." *Id.* at 673 (internal quotation marks omitted). In the pre-suit Letter of Determination, the EEOC "did not provide CRST with any notice as to the size of the class" and was unable to indicate the class size at conciliation. *Id.* at 676 (internal quotation marks omitted). We held that the EEOC impermissibly "engaged in fact-gathering as to the 'class' 'during the discovery phase of an already-filed lawsuit'" and was "us[ing] discovery in the resulting lawsuit as a fishing expedition to uncover more violations." *Id.* (alteration in original) (quoting *EEOC v. Dillard's Inc.*, No. 08–CV–1780–IEG (PCL), 2011 WL 2784516, at *7 (S.D. Cal. July 14, 2011) (slip op.)).

*CRST* concerned the issue of the EEOC's pre-suit obligations; it did not establish pleading standards. *CRST* held that the EEOC failed to reasonably investigate the class allegations—and BNSF does not argue here that the EEOC made the same mistake. But because these pre-suit obligations are prior "sequential steps in a unified scheme," *id.* at 672 (emphasis and internal quotation marks

-14-

omitted), there is some appeal to the argument that *CRST*'s holding regarding the EEOC's conciliation obligations bleed into the EEOC's pleading obligations. Regardless, we find that even if *CRST* applied, the EEOC gave adequate notice of the class size. *CRST* involved a sweeping, nationwide lawsuit. In contrast, the EEOC limited the instant claims to only women working in specific positions at the Alliance Railyard during the relevant period. Here, the EEOC is not using discovery to fish for more violations: It already identified a hostile work environment at the Alliance Railyard and seeks to use discovery to further define its claims. *See Gen. Tel.*, 446 U.S. at 333 (noting that defendants and courts "are not powerless to prevent undue hardship" caused by "the EEOC['s] broad enforcement powers" because "[t]he employer may, *by discovery and other pretrial proceedings*, determine the nature and extent of the claims that the EEOC intends to pursue against it" (emphasis added)).

The EEOC limited its claims against BNSF in geography, position, and time. It estimated the number of employees in the relevant roles and percentage of women in those roles. We conclude that these limitations gave BNSF "adequate notice of the charges against it." *CRST*, 679 F.3d at 675 (internal quotation marks omitted). That the EEOC was unable to plead the rate of turnover for women in those positions at the Alliance Railyard is not fatal at this early stage. The rate of turnover is something which "tend[s] systematically to be in the sole possession of defendants." *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("[W]hile a plaintiff must offer sufficient factual allegations to show that he or she is not merely engaged in a fishing expedition or strike suit, we must also take account of their limited access to crucial information."). Because the EEOC limited the group to women in specific roles at the Alliance Railyard during the relevant period, we are satisfied that the EEOC is not using discovery as a fishing expedition but rather to determine the nature and extent of the claims that it already identified. We therefore conclude that the district court erred in holding that the EEOC did not adequately plead the size of the group.

### 3. *Plausibility of the EEOC's Claim*

BNSF argues that even if the district court erred in imposing the additional pleading requirements, we should still affirm because the EEOC failed to state a plausible claim for relief. It argues that in *CRST*, when evaluating whether summary judgment for the defendant was proper, we said:

> [T]he EEOC must create genuine issues of material fact as to the following elements regarding each allegedly aggrieved [member of the group]:
>
>> (1) that she belongs to a protected group; (2) that she suffered unwelcome harassment; (3) that there was a causal nexus between the harassment and her membership in the protected group; (4) that the harassment affected a term, condition, or privilege of her employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action.

*CRST*, 679 F.3d at 685 (cleaned up). Thus, BNSF contends that the EEOC "must plead facts that if true would support each element required to be proved at trial." Appellee's Br. at 31. Because the EEOC did not "plead independently sufficient facts on behalf of each allegedly 'similarly aggrieved wom[a]n,'" BNSF argues that the EEOC did not plausibly state a claim. *Id.* at 33 (internal quotation marks omitted).

We disagree and conclude that the EEOC's Second Amended Complaint "contain[ed] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). The Supreme Court has said that "an employment discrimination plaintiff need not plead a prima facie case of discrimination." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 515 (2002). The EEOC acknowledged at oral argument that it would need to establish each element of a hostile work environment claim for each aggrieved individual at trial. But the EEOC is not yet required to plead a prima facie case of

discrimination. The Supreme Court said in *Twombly* that its "analysis [did not] run[] counter to *Swierkiewicz*." 550 U.S. at 569. In *Swierkiewicz*, the Court said that the appellate court "had impermissibly applied what amounted to a heightened pleading requirement by insisting that [the plaintiff] allege 'specific facts' beyond those necessary to state his claim and the grounds showing entitlement to relief." *Id.* at 570 (quoting *Swierkiewicz*, 534 U.S. at 508). In *Twombly*, the Court said, "[I]n contrast, we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.*

We hold that the EEOC stated a claim on behalf of the group that was plausible on its face. At the pleading stage, the EEOC is not yet required to identify each individual.[2] This is further supported by the Supreme Court's guidance in *General Telephone* that courts and employers "are not powerless to prevent undue hardship to the defendant" caused by "the EEOC['s] broad enforcement powers" because "[t]he employer may, by discovery and other pretrial proceedings, determine the nature and extent of the claims that the EEOC intends to pursue against it." 446 U.S. at 333. The district court found that the EEOC's First Amended Complaint stated a plausible claim for relief as to Merker. The Second Amended

---

[2]*See EEOC v. Tesla, Inc.*, 727 F. Supp. 3d 875, 891 (N.D. Cal. 2024) (rejecting the defendant's argument that the EEOC's claim failed as it did not "identify any member of the alleged group of victims . . . because the [EEOC] brings this enforcement action in its own name, so [it] is not required to identify an aggrieved individual to survive [the] motion to dismiss" (citation omitted)); *EEOC v. Rosebud Restaurants, Inc.*, 85 F. Supp. 3d 1002, 1005 (N.D. Ill. 2015) (same); *EEOC v. JBS USA, LLC*, 481 F. Supp. 3d 1204, 1216 (D. Colo. 2020) ("[T]he EEOC is not required to plead individualized or particularized facts as to each charging party."); *EEOC v. JBS USA, LLC*, No. 8:10CV318, 2015 WL 4506709, at *5 (D. Neb. July 24, 2015) (unpublished) ("[E]ven though the EEOC need not identify each individual, it must provide some indication of the scope of the class."); *EEOC v. Fed. Rsrv. Bank of St. Louis*, 84 F.R.D. 337, 340 (W.D. Tenn. 1979) ("Even under Rule 23, courts have not held that the class must be so ascertainable that every potential member can be identified at the commencement of the action. In many cases it may be impossible for the EEOC to know the names of all individuals potentially discriminated against." (citation omitted)).

Complaint further included group allegations, including information on four anonymous exemplars. Like Merker, these exemplars were in a protected class and suffered unwelcome harassment because of their sex. As employees at the Alliance Railyard, it is plausible to infer that all women in the group endured similar unsanitary bathroom conditions and saw the graffiti and sexual images at that location. The EEOC pleaded that one exemplar, Jane Doe, even contracted a urinary tract infection from unsanitary bathroom conditions. Further, several exemplars reported sex-based harassment to supervisors, who allegedly brushed off the complaints. We conclude that the EEOC stated a plausible hostile work environment claim on behalf of the group of aggrieved women. We thus reverse the district court's dismissal of these claims and remand for further proceedings.

### B. *Summary Judgment*

The district court granted summary judgment to BNSF for the claim on behalf of Merker because it found that the "harassment to which Merker was subjected during the limitations period, taken as a whole, was not sufficiently severe or pervasive to be actionable." R. Doc. 152, at 58. "We review de novo the district court's grant of summary judgment, viewing the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." *CRST*, 679 F.3d at 686 (emphasis omitted) (quoting *Mayer v. Countrywide Home Loans*, 647 F.3d 789, 791 (8th Cir. 2011)). Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The EEOC argues that the district court erred because there were genuine issues of material fact as to (1) whether the pre-limitations conduct was sufficiently similar to the post-limitations conduct such that it was one continuous violation; (2) whether the harassment was sufficiently severe and pervasive; and (3) whether BNSF knew or should have known about the harassment yet failed to take proper remedial measures. Because we agree on the first two points, we reverse the district court's grant of summary judgment. Because the district court did not address the third point, we remand on that issue.

## 1. *Continuing Violation*

The district court held that the EEOC could not rely on conduct that occurred before March 23, 2017—300 days before Merker filed her charge with the EEOC—because the pre- and post-limitations conduct was not sufficiently similar. It noted that the EEOC did not allege that the conduct was done by the same harasser or provide specific dates for the conduct. The EEOC argues that the district court erred because "a reasonable jury could find both that much of the harassment Merker experienced (including sexist comments and graffiti) occurred during the limitations period and that it was sufficiently related to the harassment that occurred before the limitations period." Appellant's Br. at 53. We agree.

"[A] Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate time period . . . set forth in 42 U.S.C. § 2000e-5(e)(1)." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002). In Nebraska, the charging party must file "the charge within 300 days of the alleged act of discrimination." *Worthington v. Union Pac. R.R.*, 948 F.2d 477, 479 (8th Cir. 1991) (citing 42 U.S.C. § 2000e-5(e)(1)); *see also id.* at 479 n.3 (explaining that because Nebraska "has established a state agency that is empowered to act against unlawful employment practices," Title VII complainants get "the benefit of a 300-day filing period"). Because "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice' . . . . the entire time period of the hostile environment may be considered" as long as at least one "act contributing to the claim occurs within the filing period." *Morgan*, 536 U.S. at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)). "[W]e consider whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Wilkie v. Dep't of Health & Hum. Servs.*, 638 F.3d 944, 951 (8th Cir. 2011) (internal quotation marks omitted). The central inquiry is whether the "[a]cts before and after the limitations period . . . are so similar in nature, frequency, and severity [that they] must be considered to be part and parcel of the hostile work environment . . . that gave rise to the action." *Id.* (cleaned up).

The EEOC alleged that there was a hostile work environment "[f]rom October 2011 to the present" at the Alliance Railyard. R. Doc. 41, at 14. Merker said that she first saw sexual graffiti in 2011; continued to see it "[e]very time [she] worked," R. Doc. 127-3, at 60; and finally reported it in 2017. The EEOC alleged that male employees made crude comments about her body as early as 2011 and that male employees generally made sexist comments. Merker testified that sexist comments occurred "all the time," *id.* at 81, up to "three times a week," *id.* at 155. The EEOC also alleged that in 2016, a male employee showed Merker a naked photo of a female BNSF employee. In 2019, Merker saw a framed photo of a man with his penis out posted near an exit. And at various times, Merker saw sexually-explicit drawings, some of which were displayed in the women's locker room and even above the seat where she worked.

We hold that the district court erred in excluding evidence outside the limitations period because a reasonable jury could find that conduct outside the limitations period was "similar in nature, frequency, and severity" such that they are "part and parcel of the hostile work environment." *Wilkie*, 638 F.3d at 951 (emphasis and internal quotation marks omitted). In *Wilkie*, we held that a Title VII plaintiff could not rely on sexual advances that occurred before the limitations period because the post-limitations conduct "did not involve personal, sexual advances made upon Dr. Wilkie." *Id.* at 952. Instead, the post-limitations conduct involved comments and complaints about the doctor's professional abilities—comments that "were substantially different" than the previous sexual advances. *Id.*; *see also Jenkins*, 646 F.3d at 1027 (finding that pre-limitations conduct actions was "not similar in nature, frequency, and severity" to post-limitations conduct because the original conduct involved sexual advances but the later actions "consisted of insults, slights, and affronts").

This case is not like *Wilkie* or *Jenkins* because there is not a marked difference between the pre- and post-limitations conduct. The EEOC sought to introduce evidence that sexually explicit pictures and drawings were posted and shared around the Alliance Railyard, both before and after the limitations period. Merker testified

that male employees often made sexist comments, which continued both before and after March 23, 2017. Further, we disagree that the graffiti allegations were too sporadic to constitute a continuing violation. *See Watson*, 619 F.3d at 943 ("[W]e reject arguments that the plaintiffs had to articulate with absolute precision the number of times they saw the graffiti and that we should analyze each viewing as a separate instance of harassment. To that end, the key difference between graffiti and a racial slur should not be overlooked: the slur is heard once and vanishes in an instant, while graffiti remains visible until the employer acts to remove it." (internal quotation marks omitted)). Merker testified that she saw the graffiti as early as 2011 and continued to see it "[e]very time [she] worked." R. Doc. 127-3, at 60. Thus, a reasonable jury could find that the conduct that occurred before March 23, 2017, was "similar in nature, frequency, and severity" to the conduct after March 23, 2017, such that they are "part and parcel of the hostile work environment." *Wilkie*, 638 F.3d at 951. The district court erred in excluding the pre-limitations conduct.

### 2. *Severe and Pervasive*

The district court found that "harassment to which Merker was subjected during the limitations period, taken as a whole, was not sufficiently severe or pervasive to be actionable." R. Doc. 152, at 58. To establish a hostile work environment claim, the EEOC must establish that Merker "experience[d] severe and pervasive harassment, enough to alter the conditions of her employment. To clear the high threshold of actionable harm, [the EEOC] had to show that the workplace was permeated with discriminatory intimidation, ridicule, and insult." *Walker-Swinton v. Philander Smith Coll.*, 62 F.4th 435, 439 (8th Cir. 2023) (cleaned up). We consider "the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Watson*, 619 F.3d at 942–43 (internal quotation marks omitted). "We remain cognizant of the fact that a work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it into a series of discrete incidents." *Id.* at 943 (internal quotation marks omitted).

We conclude that the district court erred in finding that the EEOC's claim on behalf of Merker was not sufficiently severe or pervasive as a matter of law. The district court analyzed each type of harassment in isolation—i.e., sexist comments, sexual jokes, and sexually explicit graffiti—and held that each was insufficient. It said that the graffiti presented the closest question. But it found that the graffiti was not objectively severe and pervasive because it did not threaten women and because "the graffiti was on locomotives or in railyard facilities where most of the workforce are members of the same sex (male), as opposed to a professional office." R. Doc. 152, at 58. The district court compared the graffiti to the racist graffiti that we found actionable in *Watson*, 619 F.3d at 943–44. There, the plaintiffs endured racial slurs, employees often displayed Confederate flags at work, and "[t]he plaintiffs reported [that] racial graffiti appeared in several locations," including some "carved into a workbench in the employees' locker room." *Id.* at 937–38. The district court distinguished *Watson* because the graffiti at the Alliance Railyard was "prurient and disgusting but . . . [did] not state threats to the lives of women." R. Doc. 152, at 58. It further discounted the graffiti because of the male-dominated work environment.

We disagree with the district court. First, the graffiti may still contribute to a hostile work environment even if it does not threaten the protected class. For example, in *Watson*, the defendant "emphasize[d] that none of the graffiti . . . contained specific threats against the plaintiffs." 619 F.3d at 944. Although that graffiti did threaten Black people generally, we rejected the defendant's argument because there were other incidents in which employees directly threatened or intimated the plaintiffs. *Id.* Here, even though the graffiti did not directly threaten women, we still find that a reasonable jury could find that the harassment was sufficiently severe and pervasive because there were other instances in which male employees intimidated or humiliated Merker. For example, Merker testified that men intentionally soiled the locomotive bathrooms, and because she was unable to use them, she contracted a urinary tract infection. Merker also testified that a camera was placed in the locomotive restrooms with a sign that said, "for research purposes only." R. Doc. 127-3, at 109–110. There was also evidence of humiliating or intimidating acts to other women, including a coworker who "showed Merker a

naked, sexually explicit picture of [another female] conductor," R. Doc. 134, at 29, and a women who found "[a] dead bird on the toilet seat," R. Doc. 127-3, at 110. "[E]vidence of sexual harassment directed at employees other than the plaintiff is relevant to show a hostile work environment." *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1015 (8th Cir. 1988). A reasonable jury could find that the work environment at the Alliance Railyard was intimidating and humiliating to women.

Second, we decline to excuse this graffiti because it was displayed at a male-dominated workplace. As the Sixth Circuit has said:

> We do not believe that a woman who chooses to work in the male-dominated trades relinquishes her right to be free from sexual harassment; indeed, we find this reasoning to be illogical, because it means that the more hostile the environment, and the more prevalent the sexism, the more difficult it is for a Title VII plaintiff to prove that sex-based conduct is sufficiently severe or pervasive to constitute a hostile work environment. Surely women working in the trades do not deserve less protection from the law than women working in a courthouse.

*Williams v. Gen. Motors Corp.*, 187 F.3d 553, 564 (6th Cir. 1999). Women working in primarily male-dominated trades are often the ones who most need Title VII's protection. *See EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 318 (4th Cir. 2008) ("Title VII contains no such 'crude environment' exception, and to read one into it might vitiate statutory safeguards for those who need them most."); *see also O'Rourke v. City of Providence*, 235 F.3d 713, 735 (1st Cir. 2001) (finding "no merit" to the defendant's "argument . . . that it was entitled to a jury instruction that the . . . conduct should be evaluated in the context of a blue collar environment").

Viewing the evidence in the light most favorable to the EEOC, we conclude that a reasonable jury could find that Merker was subjected to harassment that was objectively severe and pervasive. Merker said that she frequently endured discriminatory comments—up to three times a week—and saw sexually explicit graffiti every time that she worked. Merker was not merely subjected to sexually

-23-

inappropriate comments. *Cf. Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 420 (8th Cir. 2010) (concluding that "sexually-oriented remarks by . . . co-workers" did not rise to "the degree of severity that is required to demonstrate a hostile work environment"). Along with frequent vulgar and sexist comments and jokes, she also endured sexually explicit graffiti, drawings, and photographs posted around the Alliance Railyard, and she was exposed to unsanitary bathroom conditions, arguably done for the purpose of intimidating women. *See Waldo v. Consumers Energy Co.*, 726 F.3d 802, 819 (6th Cir. 2013) (finding that a reasonable jury could find that harassment was severe or pervasive when it included "constant demeaning name-calling," "the presence of sexually explicit materials in [work] trucks," "lack of access to bathrooms at rural job sites," and comments suggesting that plaintiff was having sex with coworkers); *see also CRST*, 679 F.3d at 688 (finding a "genuine issue of material fact concerning the severity or pervasiveness of the harassment" where women truck drivers were in close proximity to men who peed in plastic bottles and Ziplock bags and one man ordered the woman to clean it up). We therefore reverse the district court's grant of summary judgment for BNSF.

### 3. *BNSF's Knowledge*

The district court did not analyze the fifth element of a hostile work environment claim—whether "the employer knew or should have known of the harassment and failed to take prompt and effective remedial action." *CRST*, 679 F.3d at 685 (quoting *Sheriff v. Midwest Health Partners, P.C.*, 619 F.3d 923, 929 (8th Cir. 2010)). But BNSF argues that we can affirm the grant of summary judgment because there is no genuine issue of material fact on this element. Because the district court did not address this element, we remand the issue to the district court for its initial consideration. *See BNSF Ry. Co. v. Seats, Inc.*, 900 F.3d 545, 549 (8th Cir. 2018).

### III. *Conclusion*

Accordingly, we hold that the district court erred in granting BNSF's motion to dismiss and its motion for summary judgment. We reverse both judgments and remand for further proceedings consistent with this opinion.

_____